## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRIEDMAN'S INC., | ) | Case No. 08-10161 (CSS) |
| a Delaware corporation, <u>et al.</u>, | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| FRIEDMAN'S LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 09-51010 |
| | ) | |
| GOLDMAN SACHS CREDIT PARTNERS, L.P., | ) | |
| PLAINFIELD DIRECT INC., RAMIUS VALUE | ) | |
| AND OPPORTUNITY MASTER FUND, LTD., | ) | |
| PARCHE, LLC, CADENCE MASTER FUND | ) | |
| LTD., and IVY MA HOLDINGS CAYMAN | ) | |
| 8, LTD., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION[1]

Kenneth J. Nachbar
Robert J. Dehney (Argued)
Eric D. Schwartz
Andrew R. Remming
Matthew B. Harvey
Morris, Nichols, Arsht & Tunnell, LLP
1201 North Market Street, P.O. Box 1347
Wilmington, DE  19801

Counsel for Goldman Sachs Credit Partners
L.P., Plainfield Direct Inc., Ramius Value and

John D. Demmy
Maria Aprile Sawczuk
Stevens & Lee, P.C.
1105 N. Market Street, 7th Floor
Wilmington, DE  19801
- and -
Nicholas F. Kajon
David M. Green (Argued)
Constantine Pourakis
485 Madison Avenue, 20th Floor
New York, NY 10022

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P. 7052(a)(3).  Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Opportunity Master Fund Ltd., Parche, LLC
and Cadence Master Fund Ltd.

Counsel For Friedman's
Liquidating Trust


Dated: July 12, 2011

Sontchi, J. _____

The Plaintiff (as defined below) filed this adversary proceeding objecting to Defendants' (as defined below) claims and seeking to recharacterize them. The defendants Goldman Sachs Credit Partners L.P., Plainfield Direct Inc., Ramius Value and Opportunity Master Fund Ltd, Parche, LLC and Cadence Master Fund Ltd. (collectively, the "Defendants")[2] filed a motion to dismiss the complaint (the "Motion to Dismiss") asserting that no claim exists because it was the *intent* of the parties for the monies at issue to be debt, rather than equity.[3]  As the Plaintiff has made facially plausible allegations regarding the recharacterization of the claim (such as there was a *pro rata* contribution by the shareholders, interest payments were deferred, the interest rate was below market, interest was not paid when monies were available, and the contribution was on a subordinated unsecured basis) the Court will deny the Motion to Dismiss.

---

[2] On August 17, 2010, default judgment was entered against defendant Ivy MA Holdings Cayman 8, Ltd. ("Ivy") (Adv. D.I. 62).  Ivy is not a movant nor is included in the defined term "Defendants" for the purposes of this Memorandum Opinion.

[3] *See* Adv. D.I. 21, 22, 32, and 36.

## STATEMENT OF FACTS[4]

### A. Background

Friedman's Inc. ("Friedman's" or the "Debtor") filed a complaint objecting to the Defendants' general unsecured claims and seeking to recharacterize them as equity.[5]  Thereafter, Friedman's Liquidating Trust (the "Plaintiff") was substituted as plaintiff.[6]

Friedman's, a large retail jewelry chain, first filed for bankruptcy relief under Chapter 11 in January 2005 and exited that bankruptcy in December 2005. Crescent, another retail jewelry chain,[7] commenced bankruptcy in August 2004.  In July 2006, Crescent, while a debtor-in-possession, was purchased by Friedman's.

In order for Friedman's to purchase Crescent, it needed, among other things, additional financing in the amount of $22,041,000.   Friedman's obtained these funds from its shareholders in return for an "unsecured promissory note" due more than four (4) years later.  Friedman's used these monies, together with claim waivers from Harbinger (Friedman's largest shareholder), to purchase the Crescent business (the "Transaction").

---

[4]  The background set forth *infra* is gathered from the allegations set forth in the Complaint, as defined below.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 2010-11 (3d Cir. 2009) ("The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.").

[5]  Adv. D.I. 1 (the "Complaint").

[6]  Adv. D.I. 30; *see also* D.I. 2391 (*Order Confirming Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*).

[7]   Prior to Crescent's bankruptcy, Friedman's and Crescent had some common ownership and interrelated contractual arrangements, including loans, guarantees, and service agreements.

The financing at issue is documented in a Contribution Agreement, dated July 28, 2006 (the "Contribution Agreement").[8]  All the shareholders of Friedman's (the "Funding Participants"),[9] including the Defendants, are parties to the Contribution Agreement, whereby Friedman's obtained over $22 million (the "Funding Obligation") to purchase the stock and common equity of Crescent, which then became a wholly-owned subsidiary of Friedman's.

The Contribution Agreement provides that the Funding Obligation of each of the Funding Participants would be made on a *pro rata* basis, with each Funding Participant contributing that percentage of the Funding Obligation equal to its percentage equity interest in Friedman's.  The Contribution Agreement further provides that the Funding Participants, each of which was to receive equity of Crescent under Crescent's Plan, would contribute sufficient equity to Friedman's to enable Friedman's to acquire all of the preferred stock and common equity of Crescent.

The structure of the Contribution Agreement was recommended to the Friedman's board of directors by Peter J. Solomon Company, Friedman's financial advisors, based on an analysis by Grant Thornton, Friedman's certified public accountants, primarily as a means of maximizing net operating losses and other tax attributes of Crescent's which Friedman's would acquire under the Crescent Plan.

---

[8]  The Contribution Agreement is attached as Exhibit A to the Complaint.

[9]  The other Funding Participants (which are not Defendants) are Harbinger Capital Partners Master Fund I, Ltd., Liberation Investments, L.P., Liberation Investments Ltd., Man Mac Gemstock Limited, and Prescott Group Aggressive Small Cao, L.P.

In July 2006, pursuant to the Contribution Agreement, each of the Funding Participants advanced its respective portion of the Funding Obligation and related fees and expenses, with each Funding Participant contributing that percentage of the Funding Obligation equal to its percentage equity interest in Friedman's. In return, Friedman's issued executed "unsecured promissory notes" (individually a "Note" and collectively, the "Notes") in favor of each of the Funding Participants. The Notes were expressly subordinate and junior in right of payment to Friedman's secured lender.[10] Interest under the Notes was to accrue at the rate of 8% per annum, payable in cash quarterly in arrears, provided that so long as funds under the CIT Agreement (as defined in the margin) were outstanding and Friedman's commitments to CIT under the terms of the CIT Agreement had not been terminated, interest would not be paid but would accrue and be added on a quarterly basis to the principal amount of the Notes.

Pursuant to the Notes, and in compliance with the CIT Agreement, Friedman's could pay the interest due under the Notes (as long as the CIT Agreement was not then in default). In December 2006, when Friedman's was in full compliance with the CIT Agreement, Friedman's received a tax refund of approximately $8.5 million from the Internal Revenue Service in respect of the fiscal years 2001-2004 (the "Tax Refund").[11] Under the terms of the Notes and the CIT Agreement, the proceeds of

---

[10] Friedman's was party to a Second Amended and Restates Loan and Security Agreement dated March 8, 2006 (the "CIT Agreement"), whereby The CIT Group/Business Credit, Inc. ("CIT") was agent.

[11] The Plaintiff alleged that this tax refund was not related to the Transaction. *See Plaintiff's Memorandum in Opposition to Motion to Dismiss*, p. 4 (D.I. 32).

the Tax Refund could have been used to pay all interest then owing to the Funding
Participants under the Notes.   However, Friedman's did not exercise its discretion to
pay the interest due and owing nor was it demanded by the Funding Participants.   No
interest was ever paid on the Notes.

In January 2008, Friedman's was the subject of an involuntary petition and
a short time later the Court converted the case to a voluntary case under Chapter 11.

### B.  Procedural Posture

Friedman's filed the above-captioned action seeking to recharacterize the
Funding Contributions made by the Defendants (approximately $22 million) and
objecting to the Defendants' general unsecured claims.   The Defendants have filed the
Motion to Dismiss the Complaint claiming that the Plaintiff has failed to state a claim
because the parties *intended* the Funding Obligation to be a loan (and not equity).

## <u>LEGAL DISCUSSION</u>

### A.    The Standard Regarding Sufficiency of Pleadings When Evaluating a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted.

A motion under Rule 12(b)(6)[12] serves to test the sufficiency of the factual
allegations in the plaintiff's complaint.[13] With the Supreme Court's recent decisions in
*Bell Atlantic Corp. v. Twombly*[14] and *Ashcroft v. Iqbal*,[15] "pleading standards have

---

[12]  Federal Rules of Civil Procedure 8(a) and 12(b)(6) are made applicable to this adversary proceeding
pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012, respectively.

[13]   *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) ("The pleader is required to set forth sufficient
information to outline the elements of his claim or to permit inferences to be drawn that these elements
exist." (citations omitted)).

[14]  550 U.S. 544 (2007).

seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[16]

In *Iqbal*, the Supreme Court makes clear that the *Twombly* "facial plausibility" pleading requirement applies to all civil suits in the federal courts.[17] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss.[18]  Rather, "all civil complaints must now set out sufficient factual matter to show that the claim is facially plausible."[19]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[20]  Determining whether a complaint is "facially plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience

---

[15] 129 S. Ct. 1937 (2009).

[16] *Fowler*, 578 F.3d at 210.

[17] *See Fowler*, 578 F.3d at 210.

[18] *Iqbal*, 129 S. Ct. at 1949.  *See also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (citations omitted); *Bartow v. Cambridge Springs SCI*, 285 Fed. Appx. 862, 863 (3d Cir. 2008) ("While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions.); *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001) ("Liberal construction has its limits, for the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists on which relief could be accorded the pleader. Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.  While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions." (citations omitted)).

[19] *Fowler*, 578 F.3d at 210 (internal quotations omitted).  *See also Iqbal*, 129 S. Ct. 1950 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Buckley v. Merrill Lynch & Co. (In re DVI, Inc.)*, 2008 Bankr. LEXIS 2338 (Bankr. D. Del. Sept. 16, 2008) ("Rule 8(a) requires a showing rather than a blanket assertion of an entitlement to relief.  We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only fair notice, but also the grounds on which the claim rests."(citations omitted)).

[20] *Iqbal*, 129 S. Ct. at 1949.

and common sense.[21]  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but not shown - that the pleader is entitled to relief."[22]

   After *Iqbal*, the Third Circuit has instructed this Court to "conduct a two-part analysis.  First the factual and legal elements of a claim should be separated.  The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[23]  The court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief."[24] The Third Circuit has further instructed that "[s]ome claims will demand relatively more factual detail to satisfy this standard, while others require less."[25]

---

[21]  *Iqbol*, 129 S. Ct. at 1950.  "It is the conclusory nature of [plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.* at 1951.

[22]  *Id.* at 1950 (citations and internal quotations omitted).

[23]  *Fowler*, 578 F.3d at 210-11.  *See also Twombly*, 550 U.S. at 555 (holding that a court *must* take the complaint's allegations as true, no matter how incredulous the court may be); *Iqbal*, 129 S. Ct. at 1949-50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . When there are well-plead factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Winer* Family *Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007); *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004).  The Court may also consider documents attached as exhibits to the Complaint and any documents incorporated into the Complaint by reference.  *In re Fruehauf Trail Corp.*, 250 B.R. 168, 183 (Bankr. D. Del. 2000) (*citing PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993)).  "[I]f the allegations of [the] complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint."  *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005).  *See also Sunquest Info. Sys., Inc. v. Dean Whitter Reynolds, Inc.*, 40 F. Supp. 2d 644, 649 (W.D.Pa. 1999) ("In the event of a factual discrepancy between the pleadings and the attached exhibit, the exhibit controls." (citations omitted)).

[24]  *Fowler*, 578 F.3d at 211 (internal quotations omitted) ("[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." (citations omitted)).  "The plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim."  *Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.)*, 2008 Bankr. LEXIS 2338, at *13 (Bankr. D. Del. Sept. 16, 2008).

[25]  *In re Ins. Brokerage Antitrust Litig.*, 2010 U.S. App. LEXIS 17107, 46-47 n. 18 (3d Cir. Aug. 16, 2010).  *See also Arista Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010) (stating that *Twombly* and *Igbal* require

**B.      The Plaintiff Has Plead Sufficient Facts In Support Of Its Claim For Recharacterization.**

The focus of recharacterization in the Third Circuit is "whether the parties called an instrument one thing when in fact they intended it as something else.  That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances."[26]  The Third Circuit has rejected a "mechanistic scorecard" in favor of a case-by-case approach.[27]

"[T]he overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by applying any specific factor, but through a common sense evaluation of the facts and circumstances surrounding a

---

factual amplification where needed to render a claim plausible, not pleadings of specific evidence or extra facts beyond what is needed to make a claims plausible).

[26] *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006).  *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009) ("Recharacterization has nothing to do with inequitable conduct, however."(citation omitted)).

[27]  The Third Circuit has stated:

> While some cases are easy (e.g., a document titled a "Note" calling for payments of sums certain at fixed intervals with market-rate interest and these obligations are secured and are partly performed, versus a document issued as a certificate indicating a proportional interest in the enterprise to which the certificate relates), others are hard (such as a "Note" with conventional repayment terms yet reflecting an amount proportional to prior equity interests and whose payment terms are ignored). Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.

*Id.*

transaction:"[28]

> [C]ourts have adopted a variety of multi-factor tests borrowed from non-bankruptcy caselaw.  While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else.  That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.  Answers lie in facts that confer context case-by-case.[29]

In *Broadstripe*, this Court stated:

> "when existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity rations) do not apply as they would when lending to a financially healthy company."  However, in *SubMicron* Judge Ambro also placed considerable weight on the Judge Robinson's "reference to the conflicting testimony and relative credibility of witnesses presented by both parties," while noting that, with respect to recharacterization, "[a]nswers lie in facts that confer context case-by-case."  Given the nature of the inquiry, and the fact intensive nature of this case, triable issues of fact appear to exist.[30]

---

[28] *Radnor Holdings Corp. v. Tennenbaum Capital Ptnrs*, 353 B.R. 820, 838-839 (Bankr. D. Del. 2006).  *See also Fedders N. Am., Inc.*, 405 B.R., at 554 ("The Third Circuit has held that the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution.  This intent may be inferred from what the parties say in a contract, from what they do through their actions, and from the economic reality of the surrounding circumstances." (citations omitted)).

[29] *Submicron*, 432 F.3d at 455-456; *see also Radnor Holdings Corp.*, 353 B.R. at 838-839.

[30] *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 94 (Bankr. D. Del. 2010) (*quoting Submicron*, 432 F.3d at 456-57); *Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc. (In re Midway Games Inc.)*, 428 B.R. 303, 322 (Bankr. D. Del. 2010) ("Recharacterization is, by its nature, a fact intensive inquiry. ").

Recharacterization is a question of fact.[31] Courts have adopted various multi-factor tests to define the recharacterization inquiry.[32]  For example, in *Autostyle*, the Sixth Circuit adopted an eleven factor test.  Other courts have adopted similar multi-factor tests.  The Third Circuit has held that all of these tests include "pertinent factors."[33]

When the District Court ruled in *Submicron*, it considered the following factors:

> (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation.[34]

Although the Third Circuit affirmed this ruling it did so annunciating the overarching inquiry of "intent" rather than a factored-test.[35]  As many of the elements used by the District Court in *Submicron* are similar to those annunciated in *Autostyle* (but now only used as indicia of intent), some of those indicators will be discussed *infra*.[36] Nonetheless, as the Third Circuit frequently cautions, "[n]o mechanistic scorecard

---

[31] *Submicron,* 432 F.3d at 457.

[32]  *Compare Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 749-50 (6th Cir. Mich. 2001) (using an eleven factor test) with *Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 638 (11th Cir. 1984) (using a thirteen factor test) and *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972)).

[33]  *Submicron*, 432 F.3d at 456.

[34] *Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 323 (D. Del. 2003) (citation omitted).

[35] *Submicron*, 432 F.3d at 455-56.

[36] *Compare Autostyle*, 268 F.3d at 749-50 *with Submicron*, 291 B.R. at 323.

suffices,"[37] and this Court must not allow a multi-factor test to obscure the relevant factual and legal analysis.

    1.    *Names Given to the Instruments, if any, Evidencing the Indebtedness*

      The first factor in *AutoStyle* is the name given to the instruments. "The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans."[38]  In *Fidelity Bond and Mortgage Company*,[39] this Court recharacterized a "promissory note" made by the debtor to old shareholders of the debtor.[40]  After considering testimony, including expert testimony, the Court found: that (i) the structure at issue was created in order for the debtor to maximize certain tax benefits,[41]  (ii) the debtor did not provide for payment of any principal indebtedness under the "notes" though the first five years, and (iii) the documents referred to the amount due to the defendants as "indebtedness."[42]  After balancing these facts against the title given to the instrument, the Court concluded that

---

[37]  *Id.*

[38]  *AutoStyle*, 269 F.3d at 750.

[39]  *Fid. Bond & Mortg. Co. v. Brand (In re Fid. Bond & Mortg. Co.)*, 340 B.R. 266 (Bankr. E.D. Pa. 2006).

[40]  *Id.* at 303.

[41]  *Id.* ("The Phoenix shareholders needed to structure a tax free event, and Peat Marwick went through many gyrations and ended that we, the old shareholders, although we would have liked to have held a higher equity position in the company, were told that in order for the transaction to work, we were limited to holding 20 percent of the equity, and that in order to accomplish the transaction, we needed to take back subordinated notes in the same value that Phoenix was putting into the acquisition company." (*quoting* trial transcript)).

[42]  *Id.*

the "promissory notes" were intended to be an equity investment in the debtor and not debt.[43]

Here, similarly to *Fidelity Bond*, the monies were provided for under the "Contribution Agreement" and "Subordinated Promissory Note Due December 9, 2010." The Contribution Agreement states that "[t]he Funding Obligation and Expense Amount shall be made as *unsecured subordinated* loans to the Company."[44] This factor weighs in favor of characterizing the Funding Obligation as debt.

2.    *Presence or Absence of a Fixed Maturity Date and Schedule of Payments.*

The next factor in *AutoStyle* is the presence or absence of a fixed maturity date and schedule of payments. "The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans."[45] Here, the Notes became repayable over four years after entry into the Notes with no interim payment of principal.[46] Again, this fact is similar to the facts considered by the court in *Fidelity Bond*.[47] Accordingly, although there is a fixed maturity date, Friedman's was not required to make any principal payments for over four years. This factor weighs neither in favor of characterizing the Notes as equity nor as debt.

---

[43] *Id.*

[44] Contribution Agreement, § 1.2.

[45] *AutoStyle*, 269 F.3d at 750.

[46] Note at p. 1.

[47] *Fidelity Bond*, 340 B.R. at 303.

3.        *No Fixed Rate of Interest and Interest Payments.*

Another factor in the *AutoStyle* analysis is the presence or absence of a fixed rate of interest and interest payments.  The absence of such is a strong indication the investment was a capital contribution, rather than a loan.[48]  Here, the Notes have an interest rate of 8% per annum,[49] however the interest accrued and was added on a quarterly basis to the principal amount of the Note.[50]  The Plaintiff also alleges that the interest rate is below prime.[51] Lastly, Plaintiff points out that the Defendants could have demanded an interest payment from the Tax Refund but did not.

In *AtlanticRancher, Inc.*,[52] the bankruptcy court was faced with the characterization of the following: a promissory note with a maturity date and interest rate used for working capital and treated as debt on the debtor's books.[53]  The bankruptcy court held that "[d]espite proper documentation, [the lender] never made any effort to collect the Convertible Promissory Note or foreclose on his collateral.  He recognized that if he attempted to exercise his rights as a secured creditor it would have put the company out of business.  Thus, [the lender] did not treat the Convertible

---

[48]  *AutoStyle*, 269 F.3d at 750-51 ("At best . . . this factor cuts both ways since the deferral of interest payments indicates the possibility that during the course of the transaction the defendants eventually never expected to get repaid and converted their debt to equity.  Still, it does not change the fact that, initially at least, there was a fixed rate of interest and interest payments, indicating that the transaction was originally intended to be debt not equity.").

[49]  The Complaint alleges that the interest rate on the Notes was less than the prime rate at the time of the transaction.  Complaint at ¶ 47.

[50]  Note at ¶3.

[51]  Complaint at ¶ 47.  *See also* discussion of *American Twine L.P. v. Whitten*, 392 F.Supp.2d 13 (D. Mass. 2005), *infra*.

[52]  *Aquino v. Black (In re AtlanticRancher, Inc.)*, 279 B.R. 411 (Bankr. D. Mass. 2002).

[53]  *In re AtlanticRancher, Inc.*, 279 B.R. at 437.

Promissory Note and the rights contained in it as a loan; rather he treated the $300,000 as an investment."[54]   Although distinguishable from the case *sub judice* in that here interest was deferred and the principal payments had not yet become due, the lack of demand of payment of interest from the Tax Refund in this case indicates that the Funding Participants were treating the Notes as equity.   The deferral of interest payments, the below prime interest rate, along with the allegation that the Tax Refund was not used to pay all the interest then owing to the Funding Participants under the Notes,[55] all weigh in favor of characterizing the Notes as equity.

    4.    *Repayment Dependent on Success.*

      The *AutoStyle* test also considers the source of repayments.   "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."[56]   The Complaint alleges that the "Defendant's expectation of repayment of the Funding Obligation depended solely on the success of Friedman's business."[57]   Further, in the response to the Motion to Dismiss, the Plaintiff argues that *even if* the Tax Refund was fully collected and wholly applied to the "debt," there remained a $13,541,000 shortfall between the tax proceeds and the principal of the Notes; then at least $13,541,000 plus all accrued interest on the

---

[54]  *Id.* (citations to transcript omitted).

[55]  Complaint at ¶¶40-41.

[56]  *AutoStyle*, 269 F.3d at 751; *Stinnett's Pontiac Service, Inc. v. Commissioner of IRS*, 730 F.2d 634, 639 (11th Cir. 1984) (holding that the only way of repayment was from earnings produced from operations because the only non-earning source available for repayment was the sale of a boat which was inadequate to fulfill the obligation).

[57]  Complaint at ¶49.

Notes could be paid *solely* from Friedman's earnings.[58]  There have been no allegations nor argument that there was another source of payment for the Transaction.  Therefore, this factor weighs in favor of characterizing the Notes as equity.[59]

     5.     *Inadequacy of Capitalization.*

     *AutoStyle* also considers the adequacy of capitalization.  "Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans."[60]  The Plaintiff has alleged in the Complaint that Friedman's was undercapitzalized as a result of the Funding Obligations and purchase of Crescent.  In fact, the Complaint specifically refers to Friedman's balance sheet pre- and post-acquisition.[61]  This factor weighs in favor of characterizing the Notes as equity.

     6.     *Identity of Interests Between Creditor and Stockholder.*

     Another factor in the *AutoStyle* test is the identity of interest between the creditor and the stockholder.  "If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated.  On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt.  Where there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan this evidence standing alone is almost overwhelming."[62]  Here, the Complaint

---

[58] Plaintiff's Opposition to Motion to Dismiss (D.I. 32), at pp. 21-22.

[59] *See also* discussion re: sinking fund, *infra*.

[60] *AutoStyle*, 269 F.3d at 750-51.

[61] Complaint at ¶¶44-46.

[62] *AutoStyle*, 269 F.3d at 751.

alleges that there is an "exact correlation" between the ownership interests of the equity holders and their proportionate share of the alleged loan.[63]  This factor weighs in favor of characterizing the Notes as equity.

7.        *Security, if any, for the Advances.*

Another factor in the *AutoStyle* test is the presence or absence of security for the advances made under the alleged debt.  "The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans."[64]  Here, the Note was fully subordinated to the CIT Obligation and was unsecured.[65]  This factor weighs in favor of characterizing the Notes as equity.

8.    *Ability to Obtain Financing From Outside Lending Institutions.*

Yet another factor in the *AutoStyle* test is the debtor's ability to obtain outside financing.  "When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans."[66]  There are no allegations in the Complaint regarding alternative sources of financing.  Therefore, this factor weighs neither in favor of  characterizing the Notes as equity nor as debt.

---

[63]  Complaint at ¶¶ 28-37.

[64]  *AutoStyle*, 269 F.3d at 752.

[65]  Note at ¶¶ 6 and 6.1–6.6.

[66]  *AutoStyle*, 269 F.3d at 752.

9.    *Extent to Which the Advances Were Subordinated to the Claim of Outside Creditors.*

Another factor in the *AutoStyle* test is the extent to which the payments to be made are subordinated to the claims of outside creditors.  "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions, not loans."[67]  The Note expressly states that the Funding Obligation is subordinate to Friedman's secured debt.[68]  The Notes entitle the Funding Participants to payment ahead of subordinated debt and equity, and on par with trade and other general unsecured debt.  The Defendants argue that as the Notes provide for a right to payment above other interests and therefore is indicative of equity.  This factor weighs in favor of characterizing the Notes as debt.

10.    *The Extent to Which the Advances Were Used to Acquire Capital Assets.*

Another factor in the *AutoStyle* test is whether the advances were used to acquire capital assets.  "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."[69]  The Funding Obligation was used for the purchase of Crescent, which became a wholly owned subsidiary of Friedman's.[70]  Therefore, this factor weighs in favor of characterizing the Notes as equity.

---

[67]  *AutoStyle*, 269 F.3d at 752.

[68]  Note at ¶¶1, 6, and 6.1-6.6.

[69]  *AutoStyle*, 269 F.3d at 752.

[70]  *See* Contribution Agreement, p. 1 ("WHEREAS, pursuant to the Second Amended Plan of Reorganization (Dated June 7, 2006), as Modified (as further modified or amended, the "Plan") of Crescent Jewelers, a California corporation ("Crescent"), the Company, the Funding Participants and the Claimsholders are to receive, collectively, 100% of the shares of common stock of Crescent to be issued

11.    *Presence or Absence of a Sinking Fund.*

Another factor in the *AutoStyle* test is the presence or absence of a sinking fund to provide repayments.[71]   The Complaint alleges that: "Friedman's never established a sinking fund to provide for the repayment of the Notes, and neither the Contribution Agreement nor the Notes provided for the establishment of a sinking fund for that purpose."[72]   Instead, Friedman's asserts that any repayment of the Note depended solely on the success of Friedman's business.  Therefore, this factor weighs in favor of characterizing the Notes as equity.

12.    *Presence or absence of voting rights*

A factor discussed by the District Court in *Submicron* is the presence or absence or voting rights.[73]   The Complaint does not allege nor does the Promissory Notes, or Contribution Agreement grant any of the Funding Participant the right to vote.  Therefore, this factor weighs in favor of characterizing the Notes as debt.

13.    *Other Considerations*

The Defendants argue that the parties' intended the Funding Obligation to be a loan.  The Defendants liken this case to *American Twine*.[74]   In *American Twine*, the court, was faced with validity of a $10 million secured bridge loan that certain defendants and other individuals extended to an entity of which they were also

---

upon the emergence by Crescent from its chapter 11 bankruptcy proceedings"); *see also* Contribution Agreement, § 1.1.

[71]  *Autostyle*, 269 F.3d at 753.

[72]  Complaint, ¶ 49.

[73]  *SubMicron*, 291 B.R. at 323.

[74]  *American Twine L.P. v. Whitten*, 392 F.Supp.2d 13 (D. Mass. 2005).

shareholders.[75]  The bridge loan carried a 35% annual interest rate and a one year term

and included no warrants or convertibility features.[76]  The lenders received a security

interest in all of the borrower's assets.[77]  When structuring the loan the borrower and

lender considered, but rejected, a proposal that the investment take the form of equity

and a proposal to include warrants and convertibility features.[78]

In reaching its conclusion after the trial that the transaction was debt and

not equity,[79] the *American Twine* court evaluated expert testimony and testimony of

some of the key players in the transaction.[80]  The *American Twine* court also considered

the reasonableness of the terms, including interest rate of 35% (an above-market rate)

and the security interest granted in the borrower's assets, in reaching its conclusion that

these particular terms provided for the risky nature of the investment.[81]

The Defendants in this case argue that because Friedman's considered,

but rejected, an equity infusion that the Funding Obligation cannot be considered

equity.[82]  The Defendants correctly identify one similarity between the transaction in

---

[75]  *Id.* at 15.

[76]  *Id.* at 18.

[77]  *Id.*

[78]  *Id.* at 19.

[79]  *Id.* at 23 ("Some of the *Atlantic Rancher* factors favor treating the Bridge Loan as capital and some favor treating it as debt.  In the aggregate, an analysis of the *Atlantic Rancher* factors leads convincingly, but not overwhelmingly, to the conclusion that the Bridge Loan should be treated as debt.")

[80]  *American Twine*, 392 F. Supp. at 19

[81]  *Id.* at 20.

[82]  The Motion to Dismiss refers to paragraphs 28 and 38 of the Complaint and states that an equity infusion was expressly rejected.  However, the Court's reading of the Complaint, taking all allegations to be true, does not necessarily agree with the Defendant's characterizations of the allegations in the Complaint.

*American Twine* and this case.  Nonetheless, when one applies the entirety of the issues considered in *American Twine* to this case, one readily concludes that the Plaintiff has asserted a plausible claim that the Notes are equity.  For example, in this case there was a *pro rata* contribution by the shareholders (based in relation to each's equity holdings), the payment of the "debt" to the Funding Participants depended upon Friedman's Tax Refund, non-payment of interest, the lack of a security interest, and the fact that the "debt" was subordinated.

The Defendants also argue that as Friedman's had the option of choosing debt or equity when formulating the Transaction and that this explicitly proves "intent" for the Transaction to be debt.  At this point in the proceedings, however, the *only* thing that shows "intent" are the actual terms of the Contribution Agreement and Note, and not the name/vocabulary of the Transaction documents.[83]

### C.    Conclusion

For those keeping score at home the factors identified above weigh in favor of characterizing the Notes as equity by a score of: Equity 7, Debt 3 and Neither 2.  But, of course, this Court is not to base its decision on such a mechanical exercise.  Rather, the Court is to use its evaluation of the above described factors to make its decision "through a common sense evaluation of the facts and circumstances surrounding a transaction."[84]   While the Defendants' arguments may ultimately prevail regarding intent, at this stage of the proceedings, taking all the allegations in the Complaint as

---

[83]  *See AutoStyle*, 269 F.3d at 750.
[84]  Radnor Holdings Corp., 353 B.R. at 838-839.

true,[85] the Court finds that the Plaintiff has alleged plausible facts that require a further evidentiary record for the Court to characterize the Notes as debt or equity.

## CONCLUSION

For the foregoing reasons, the Court will deny the motion to dismiss as the Complaint alleges facially plausible facts, which taken as true, may constitute a recharacterization claim.  An order will be issued.

---

[85] *Fowler*, 578 F.3d at 210-11.